IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

RICHARD NYAMWANGE,      :
                                  :
        Petitioner        :
                                  :   CIVIL NO. 1:10-CV-0463
                                  :
       v.                  :   Hon. John E. Jones III
                                  :
                                  :
JON D. FISHER,           :
                                  :
       Respondent.      :

## MEMORANDUM

June 23, 2011

**THE BACKGROUND OF THIS MEMORANDUM IS AS FOLLOWS:**

Petitioner Richard Nyamwange ("Petitioner" or "Nyamwange"), a former state inmate, who presently is a detainee of the United States Immigration and Customs Enforcement ("ICE") Office confined at the Pike County Correctional Facility in Lords Valley, Pennsylvania, initiated the above action through counsel by filing a Petition for Writ of Habeas Corpus ("Petition") under the provisions of 28 U.S.C. § 2254. (Doc. 1.) Nyamwange challenges his 2007 conviction in the Court of Common Pleas of Monroe County, Pennsylvania, of one (1) count of sexual assault, one (1) count of aggravated indecent assault, and two (2) counts of indecent assault. At the time of filing, Nyamwange was serving the two and one-half (2 ½) to five (5)

year sentence of imprisonment imposed by the Court of Common Pleas of Monroe

County.[1]  The Petition is fully briefed and ripe for disposition.  For the reasons set

forth herein, the Petition will be denied.

## PROCEDURAL BACKGROUND

### I.      Criminal Conviction in State Court

The facts surrounding the events that gave rise to Nyamwange's arrest and his

conviction in the Monroe County Court of Common Pleas were summarized by the

Pennsylvania Superior Court in its Memorandum disposing of his direct appeal from

his judgment of sentence as follows:

> In the summer of 2006, the victim was a 19-year-old student at East
> Stroudsburg University and was employed in a work-study program run
> by the Office of Business Management and Economics. [Nyamwange]
> was professor of economics at the university, and hired the victim to do
> secretarial work for him.  For unrelated reasons, [Nyamwange] did not
> pay the victim at the end of the summer, and the victim, a local resident,
> transferred to a new school.  Accordingly, when the victim was home for
> Thanksgiving, she agreed to have lunch with [Nyamwange] for the

---

[1]Although it appears that Nyamwange has completed service of the sentence of imprisonment
that was imposed following the judgment of sentence that he challenges in the instant Petition, the
trial court also imposed a consecutive five (5) year term of probation to follow the sentence of
imprisonment.  Where Nyamwange remains on probation, he continues to satisfy the custody
requirement of the federal habeas corpus statute.  *See Leyva v. Williams*, 504 F.3d 357, 363 (3d Cir.
2007) (citing *Lee v. Stickman*, 357 F.3d 338, 342 (3d Cir. 2004)).  Moreover, even if Nyamwange's
sentence were fully served, inasmuch as he is in ICE custody facing potential deportation from the
United States as a result of the conviction that he challenges in the instant Petition, the instant
Petition has not been rendered moot.  *See United States v. Romera-Vilca*, 850 F.2d 177, 179 (3d Cir.
1988) (prisoner's motion to vacate his conviction was not mooted when he was released from
custody where he faced potential deportation as a collateral consequence of conviction).

2

purpose of receiving her back pay. [Nyamwange] forgot his checkbook, however, and the victim accepted [Nyamwange's] invitation to return to his home for the purposes of being paid and seeing the home remodeling work that [Nyamwange] was having performed.  The parties drove separately to [Nyamwange's] home.

Once there, [Nyamwange] took the victim on a tour of the premises, ending in [Nyamwange's] upstairs bedroom.  At [Nyamwange's] suggestion, the victim remained in [Nyamwange's] bedroom watching television until it was time for her to leave for her 3:00 p.m. job at the local mall. [Nyamwange] went downstairs.  From prior to lunch until this point in time, the victim had been in constant cell phone/texting contact with Joseph Tepedino, her boyfriend.  N.T., 9/6/07, at 40-42, 45.  Twenty minutes later, [Nyamwange] came upstairs and wrote the victim a check for the $75.00 he owed to her.

According to the victim's testimony, as she rose to leave, [Nyamwange] 'fell into her,' knocking her back on his bed. *Id.* at 47.  The victim feared that [Nyamwange] had a heart attack, and asked if he was all right.  The victim testified that [Nyamwange] then stated, 'it's been so long,' and tried to kiss her. *Id.* at 47-48.  The victim, who at this point began to cry, told [Nyamwange] 'no,' and tried to squirm out from under [Nyamwange's] body. *Id.* at 48-49.  Using one hand, [Nyamwange] pinned the victim's arms above her head and continued to kiss the victim's mouth and 'all over her cheeks.'  He also licked her chest. *Id.* at 50-51.  In an unsuccessful effort to make her assailant stop, the victim bit [Nyamwange's] lip and nipple. *Id.* at 51-52.

While rubbing his clothed body against the victim's body, [Nyamwange] pushed up the victim's skirt and pushed aside the shorts and panties that she wore underneath. *Id.* at 52. [Nyamwange] digitally penetrated the victim's vagina. *Id.* at 53. [Nyamwange] then exposed his penis and put it inside the victim's vagina. *Id.* at 54.  The victim testified as follows:

> [Victim]: I kept telling him no, and he kept telling me that it wasn't going to hurt me and that he wasn't going to come in me, and he kept saying it's been so long.

Q: When you told him no, [victim], did he stop and get off you?

[Victim]: No.

Q: At any point, [victim], did you see or do you know whether or not he had ejaculated?

[Victim]: Yeah.  He had let go of me, and then he had ejaculated into his hand, and then he got up and went to the bathroom, and that was when I left.

**Id.** at 55.

The victim testified that she ran downstairs, and [Nyamwange] followed. He 'bear hugged' her and offered cash instead of a check.  **Id.** at 57.  The victim threw the money at [Nyamwange] and ran out of the front door. The victim testified that she drove to the end of the street, stopped her car, and cried.  **Id.** at 58.  She telephoned Tepedino and the two arranged to meet at the mall where the victim was employed.  **Id.** at 59.

[Nyamwange] subsequently was arrested and charged. [Nyamwange's] omnibus pre-trial motion was denied, in pertinent part, on April 24, 2007. Docket Entry 19.  An opinion was filed the same day.  **Id.**

On September 10, 2007, a jury convicted [Nyamwange] as stated above. Sentencing occurred on February 1, 2008.  Bail pending appeal was denied.  No other post-sentence motion was filed.  A timely notice of appeal was filed on February 15, 2008.  In February 20, 2008, the court directed [Nyamwange] to file a Pa. R.A.P. 1925(b) statement of errors complained of on appeal within 21 days. [Nyamwange] complied on March 5, 2008.  The court filed its initial opinion on April 29, 2008, and a supplemental opinion on May 9, 2008.

(Doc. 1-3 at 2-4, 6/8/09 Pa. Super. Ct. Op.)[2]

---

[2]Throughout this Memorandum, citations to page numbers of documents filed to the docket in this action are to the page numbers generated by the CM/ECF Filing System.

## II.      Direct Appeal

In his direct appeal from his judgment of sentence, Nyamwange raised three (3)

issues for review, which the Pennsylvania Superior Court summarized as follows:

1.      Whether a new trial is required since the trial court erred by
        finding the Rape Shield Statute restricted Nyamwange's cross-
        examination of the alleged victim and Joseph Tepedino, her
        boyfriend, where the defense was arguing she fabricated her lack
        of consent to protect her relationship with Tepedino, where
        Tepedino's DNA was found on the alleged victim's thong, where
        she denied having consensual sex with anyone within two weeks
        prior to the incident and where Tepedino denied having a
        relationship with the alleged victim prior to the alleged victim's
        incident with Nyamwange?[3]

2.      Whether a new trial is required since the trial court failed to read
        Nyamwange's proposed charge on reasonable mistake of fact?

3.      Whether a new trial is required since the trial court erred in not
        granting Nyamwange's Omnibus Pre-trial Motion to suppress what
        was seized by the Commonwealth's search warrants?

(*See* Doc. 1-3 at 4-5, 6/8/09 Pa. Super. Ct. Op.)  The Pennsylvania Superior Court

concluded that each of Nyamwange's arguments was devoid of merit, and therefore,

affirmed the judgment of sentence.  (*See id.* at 5-13.)

---

[3]In his concise statement of matters complained of on appeal pursuant to Pa. R. App. P.
1925(b), Nyamwange specifically stated that, "Since the issue was primarily *he said, she said*, the
court's limitation on cross examination, prohibition of introduction of Tepedino's DNA from the
thong, and exclusion of the alleged victim's statements to the SAFE nurse about not having
consensual relations within two (2) weeks of the incident prejudiced Nyamwange's defense and
denied him due process and the right to confront his accusers.  Thus, a new trial should be ordered."
(*See* Doc. 9-13 at 26 ¶ 7, 1925(b) Statement.)

Nyamwange subsequently filed a Petition for Allowance of Appeal with the Pennsylvania Supreme Court in which he raised the following two (2) questions for review:

1.     Whether by limiting Nyamwange's cross examination of D.P. and Tepedino and denial of admittance of evidence of boyfriend's DNA on D.P.'s thong, the trial court denied Nyamwange his constitutional right to due process and to confront witnesses against him.

2.     Whether the trial court erred when it failed to read Nyamwange's proposed charge on reasonable mistake of fact?

(Doc. 1, Petition, at 6 ¶ 9(m).)  By Order dated November 24, 2009, the Pennsylvania Supreme Court denied Nyamwange's Petition for Allowance of Appeal.  (Doc. 1-5, 11/24/09 Order.)

## III.    Petition for Writ of Habeas Corpus

On March 2, 2010, Nyamwange's counsel filed the instant Petition on his behalf.  (Doc. 1.)  In his Petition, he raises the following issue for review:

Whether the trial court's limitations on cross examination of complainant and her boyfriend and the trial court's denial of Petitioner's use of evidence of complainant's boyfriend's DNA on the complainant's thong to confront the complainant and her boyfriend after they denied having a relationship violated Petitioner's constitutional right to due process and to confront witnesses where the defense argued complainant lied about her consensual sexual encounter with Petitioner to mask her infidelity.

(Doc. 1 at 7 ¶ 12.)

6

By Order dated March 3, 2010, we directed service of the Petition on Respondents.  (Doc. 3.)  A Response to the Petition was filed on behalf of Respondents by the Monroe County District Attorney's Office on March 23, 2010. (Doc. 7.)  Respondents subsequently filed supporting exhibits, consisting of the reproduced record filed by Nyamwange on appeal to the Pennsylvania Superior Court (Docs. 10-5 through 10-8); briefs submitted to the Pennsylvania Superior Court on direct appeal, including Nyamwange's appellate brief (Doc. 10), the Commonwealth's appellate brief (Doc. 10-2), and Nyamwange's reply brief (Doc. 10-4); and a copy of the Pennsylvania Superior Court's June 8, 2009 Memorandum affirming Nyamwange's judgment of sentence (Doc. 10-3).  On April 6, 2010, Nyamwange filed a reply brief (Doc. 9) and an Appendix consisting of the portions of the reproduced record submitted by him on direct appeal that he identifies as relevant to the issue raised in the instant Petition.  (Docs. 9-2 through 9-13.)  Accordingly, the Petition is fully briefed and ripe for disposition.

## STANDARD OF REVIEW

A habeas corpus petition pursuant to 28 U.S.C. § 2254 is the proper mechanism for a state prisoner to challenge the "fact or duration" of his confinement. *Preiser v. Rodriguez,* 411 U.S. 475, 498-499 (1973).  "[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."

*Estelle v. McGuire,* 502 U.S. 62, 67-68 (1991).  Rather, federal habeas review is restricted to claims based "on the ground that [petitioner] is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a); *Estelle,* 502 U.S. at 67-8; *see also Pulley v. Harris,* 465 U.S. 37, 41 (1984); *Johnson v. Rosemeyer,* 117 F.3d 104 (3d Cir. 1997).

To satisfy the exhaustion requirement, a federal habeas petitioner must have presented the facts and legal theory associated with each claim through "one complete round of the State's established appellate review process."[4]  *O'Sullivan v. Boerckel*, 526 U.S. 838, 844-45 (1999); *see also Holloway v. Horn,* 355 F.3d 707, 714 (3d Cir. 2004).  The exhaustion requirement is satisfied if a petitioner's claims are either presented to the state courts directly on appeal from the judgment of sentence, or through a collateral proceeding, such as a PCRA petition.  *Swanger v. Zimmerman*, 750 F.2d 291, 295 (3d Cir. 1984).  It is not necessary for a petitioner seeking federal habeas relief to present his federal claims to state courts *both* on direct appeal *and* in a PCRA proceeding.  *Id.*  However, a petitioner is not deemed to have exhausted the

---

[4]Pursuant to Pennsylvania Supreme Court Order 218, effective May 9, 2000, issues presented to the Pennsylvania Superior Court are considered exhausted for the purpose of federal habeas corpus relief under Section 2254.  *See In re: Exhaustion of State Remedies in Criminal and Post-Conviction Relief Cases,* No. 218, Judicial Administration Docket No. 1 (May 5, 2000) (per curiam). As such, petitioners are not required to seek review from the Pennsylvania Supreme Court in order to give the Pennsylvania courts a "full opportunity to resolve any constitutional claims."  *Lambert v. Blackwell*, 387 F.3d 210, 233 (3d Cir. 2004).

remedies available to him if he has a right under the state law to raise, by any available procedure, the question presented.  28 U.S.C. § 2254(c); *Castille v. Peoples*, 489 U.S. 346, 350 (1989).  The petitioner bears the burden of demonstrating that he has satisfied the exhaustion requirement. *Lines v. Larkins*, 208 F.3d 153, 159 (3d Cir. 2000) (citing *Lambert v. Blackwell*, 134 F.3d 506, 513 (3d. Cir. 1997)).

In the case at hand, there is no dispute that the sole issue raised by Nyamwange in the instant Petition was fully exhausted by him in his direct appeal from his judgment of sentence.

Once a court has determined that the exhaustion requirement is met, as is the case here, and therefore review of the issues presented in a habeas petition on the merits is warranted, the scope of that review is set forth in 28 U.S.C. § 2254(d).  That section states, in relevant part, that exhausted claims that have been adjudicated on the merits by the state courts are subject to review under the standard of whether they are "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States,"  28 U.S.C. § 2254(d)(1), or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  § 2254(d)(2).  The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") places the burden on a petitioner to make this showing. *Williams v.*

*Taylor*, 529 U.S. 362 (2000).

In a recently issued opinion, the United States Court of Appeals for the Third

Circuit set forth the following description of the framework for analysis required

under § 2254(d):

> Consistent with Supreme Court precedent, we read § 2254(d) to require three distinct legal inquiries. *See, e.g., Harrington v. Richter,* - - - U.S. - - - -, 131 S.Ct. 770, 785, 178 L.Ed.2d 624 (2011). The first is whether the state court decision was "contrary to ... clearly established Federal law, as determined by the Supreme Court of the United States." § 2254(d)(1). The second is whether the state court decision "involved an unreasonable application of" such law. § 2254(d)(1). And the third is whether the state court decision "was based on an unreasonable determination of the facts in light of the evidence presented" to the state court. § 2254(d)(2).
>
> The test for § 2254(d)(1)'s "unreasonable application of" clause is as follows: "[a]n 'unreasonable application' occurs when a state court 'identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts' of petitioner's case." *Rompilla v. Beard,* 545 U.S. 374, 380, 125 S.Ct. 2456, 162 L.Ed.2d 360 (2005) (quoting *Wiggins v. Smith,* 539 U.S. 510, 519, 520, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003)). For purposes of § 2254(d)(1), "[i]t is not enough that a federal habeas court, in its independent review of the legal question, is left with a firm conviction that the state court was erroneous." *Lockyer v. Andrade,* 538 U.S. 63, 75, 123 S.Ct. 1166, 155 L.Ed.2d 144 (2003) (internal quotations omitted). "Under § 2254(d)(1)'s 'unreasonable application' clause . . . a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 75–76, 123 S.Ct. 1166 (quoting *Williams v. Taylor,* 529 U.S. 362, 411, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000)). Rather, "[t]he state court's application of clearly established law must be objectively unreasonable" before a federal court may grant the writ. *Andrade,* 538 U.S. at 75, 123 S.Ct. 1166.

The test for § 2254(d)(1)'s "contrary to" clause is whether the state court decision "applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases, or if it confronts a set of facts that is materially indistinguishable from a decision of [the Supreme] Court but reaches a different result." *Brown v. Payton,* 544 U.S. 133, 141, 125 S.Ct. 1432, 161 L.Ed.2d 334 (2005) (citing *Williams,* 529 U.S. at 405, 120 S.Ct. 1495, and *Woodford v. Visciotti,* 537 U.S. 19, 24–25, 123 S.Ct. 357, 154 L.Ed.2d 279 (2002)).  Of course, a state court's resolution of a question that the Supreme Court has not resolved can be neither contrary to, nor an unreasonable application of, the Court's precedent.  *See Kane v. Garcia Espitia,* 546 U.S. 9, 126 S.Ct. 407, 163 L.Ed.2d 10 (2005).

The test for § 2254(d)(2)'s "unreasonable determination of facts" clause is whether the petitioner has demonstrated by "clear and convincing evidence," § 2254(e)(1), that the state court's determination of the facts was unreasonable in light of the record.  *See Rice v. Collins,* 546 U.S. 333, 338–339, 126 S.Ct. 969, 163 L.Ed.2d 824 (2006) ("State-court factual findings, moreover, are presumed correct; the petitioner has the burden of rebutting the presumption by 'clear and convincing evidence.'") (quoting § 2254(e)(1)) (citing *Miller–El v. Dretke,* 545 U.S. 231, 240, 125 S.Ct. 2317, 162 L.Ed.2d 196 (2005)); *see also Simmons v. Beard,* 590 F.3d 223, 231 (3d Cir.2009) ("Under the § 2254 standard, a district court is bound to presume that the state court's factual findings are correct, with the burden on the petitioner to rebut those findings by clear and convincing evidence.").  Importantly, the evidence against which a federal court measures the reasonableness of the state court's factual findings is the record evidence at the time of the state court's adjudication. *Cullen v. Pinholster,* - - - U.S. - - - - , - - - - – - - - -, 131 S.Ct. 1388, 1401–03, - - - L.Ed.2d - - - - (2011).

*Rountree v. Balicki,* - - - F.3d - - - -, 2011 WL 1815965, at *5-6 (3d Cir. May 13, 2011).

Like the "unreasonable application" prong of paragraph (1), a factual

11

determination should be adjudged "unreasonable" under paragraph (2) only if a court finds that a rational jurist could not reach the same finding on the basis of the evidence in the record.  28 U.S.C. § 2254(d)(2); *Porter v. Horn*, 276 F. Supp. 2d 278, 296 (E.D. Pa. 2003); *see also Torres v. Prunty*, 223 F.3d 1103, 1107-08 (9th Cir. 2000); *cf. Jackson v. Virginia,* 443 U.S. 307, 316 (1979).  Only when the finding lacks evidentiary support in the state court record or is plainly controverted by evidence therein should the federal habeas court overturn a state court's factual determination. *Porter*, 276 F. Supp. 2d at 296; *see also Williams*, 529 U.S. 362 at 408-09.

As stated by the Third Circuit Court of Appeals in *Rountree*, habeas relief only may be granted if the petitioner shows that the state court decision satisfies one of the three tests set forth above.  We now turn to an analysis of the instant Petition with the above framework in mind.

## DISCUSSION

Nyamwange asserts that the trial court's limitation on cross-examination of the victim and her boyfriend and its denial of Nyamwange's use of evidence of the victim's boyfriend's DNA on her thong to confront her and her boyfriend after they denied having a relationship during their trial testimony violated Nyamwange's constitutional right to due process and to confront witnesses where the defense argued that the victim lied about her consensual sexual encounter with Nyamwange to mask

12

her infidelity.

Nyamwange's issue implicates Pennsylvania's Rape Shield Statute, which

provides as follows:

**§ 3104.  Evidence of victim's sexual conduct**

**(a) General rule.**--Evidence of specific instances of the alleged victim's past sexual conduct, opinion evidence of the alleged victim's past sexual conduct, and reputation evidence of the alleged victim's past sexual conduct shall not be admissible in prosecutions under this chapter except evidence of the alleged victim's past sexual conduct with the defendant where consent of the alleged victim is at issue and such evidence is otherwise admissible pursuant to the rules of evidence.

**(b) Evidentiary proceedings.**--A defendant who proposes to offer evidence of the alleged victim's past sexual conduct pursuant to subsection (a) shall file a written motion and offer of proof at the time of trial. If, at the time of trial, the court determines that the motion and offer of proof are sufficient on their faces, the court shall order an in camera hearing and shall make findings on the record as to the relevance and admissibility of the proposed evidence pursuant to the standards set forth in subsection (a).

18 Pa. Cons. Stat. § 3104.  "The purpose of the Rape Shield Law is to prevent a trial

from shifting its focus from the culpability of the accused toward the virtue and

chastity of the victim."  *Commonwealth v. Burns*, 988 A.2d 684, 689 (Pa. Super. Ct.

2009) (citing *Commonwealth v. Allburn*, 721 A.2d 363, 366-67 (Pa. Super. Ct. 1998),

*appeal denied*, 739 A.2d 163 (Pa. 1999)).  "Because there exists no logical correlation

between a victim's chastity or promiscuity and the likelihood that the victim was in

fact raped, the introduction of such evidence can serve only to confuse or prejudice the factfinding process." *Commonwealth v. Wall*, 606 A.2d 449, 455 (Pa. Super. Ct. 1992) (citing *Commonwealth v. Majorana*, 470 A.2d 80, 83-84 (Pa. 1983) ("in an enlightened age, a complaining witness' prior consensual sexual activity is simply not relevant to show present consent"); *Commonwealth v. Reefer*, 573 A.2d 1153, 1154 (Pa. Super. Ct. 1990) (testimony showing sexual contents not "in any way relevant" to show consent)). "By excluding from trial evidence of the victim's past sexual contact, the possibility of confusion and prejudice is thus minimalized." *Wall*, 606 A.2d at 445 (citing *Commonwealth v. Johnson*, 566 A.2d 1197, 1199 (Pa. Super. Ct. 1989) (*en banc*), *appeal granted*, 581 A.2d 569 (Pa. 1990)).

In addition to the specific exception contained in 18 Pa. Cons. Stat. § 3104(a) allowing for the introduction of "evidence of the alleged victim's past sexual conduct with the defendant where consent of the alleged victim is at issue and such evidence is otherwise admissible pursuant to the rules of evidence," Pennsylvania courts have recognized other instances where a victim's past sexual history may be introduced into evidence at trial. These exceptions include: "(1) evidence that negates directly the act of intercourse with which a defendant is charged; (2) evidence demonstrating a witness' bias or evidence that attacks credibility; and (3) evidence tending to directly exculpate the accused by showing that the alleged victim is biased and thus has motive

14

to lie, fabricate, or seek retribution via prosecution." *Burns*, 988 A.2d at 690 (citing *Allburn,* 721 A.2d at 367). "These exceptions to the general rule have been recognized in an effort to reconcile the effect of the statute in excluding evidence with the accused's sixth amendment right to confrontation and cross-examination." *Commonwealth v. Guy*, 686 A.2d 397, 400 (Pa. Super. Ct. 1996).

As stated in *Wall*, in *White v. Illinois*, 502 U.S. 346 (1992), the United States Supreme Court described the basic purpose of the Confrontation Clause as "the promotion of the 'integrity of the factfinding process,'" 502 U.S. at 356-57 (quoting *Coy v. Iowa,* 487 U.S. 1012, 1020 (1988); *Kentucky v. Stincer*, 482 U.S. 730 (1987)), which is accomplished "'by assuring that 'the trier of fact [has] a satisfactory basis for evaluating the truth.'" *Wall*, 606 A.2d at 456 (quoting *California v. Green*, 399 U.S. 149, 161 (1970)). The *Wall* Court also observed that "[t]he search for truth . . . is a common bulwark upon which both the Rape Shield Law and the Confrontation Clause are built. Thus, in many cases, the intent of both the Rape Shield Law and the Confrontation Clause may be advanced without encroaching upon the other's domain." *Id.* However, the *Wall* Court made the following observation as to when the Rape Shield Law and Confrontation Clause may conflict:

> It is only where the truth determining process is not forwarded by the exclusion of past sexual history that the Rape Shield Law and the Confrontation Clause may not be reconciled. Under these relatively rare circumstances, as this Court has previously recognized, 'Rape Shield

laws, if rigidly construed, could impermissibly encroach upon a defendant's right to confront and cross-examine witnesses which is secured by the United States and Pennsylvania Constitutions.' *Commonwealth v. Nieves, supra*, 399 Pa. Superior Ct. at 287, 582 A.2d at 346. In such rare cases 'the Rape Shield Law must bow to the need to permit an accused an opportunity to present genuinely exculpatory evidence . . .' *Id.*

*Id.*

The *Wall* Court then noted that, in Pennsylvania, "a relatively elaborate procedure" has been developed to determine when an exception to the Rape Shield law should be applied. Pursuant to this procedure, a defendant is required to submit to the court a *specific* written proffer describing "exactly what evidence he or she seeks to admit and precisely why it is relevant to the defense." *Id.* (citations omitted). In the case at hand, the written proffer procedure was followed. Prior to trial, on February 7, 2006, Nyamwange filed a timely Omnibus Pretrial Motion, in which he, *inter alia*, included a written proffer under Pennsylvania's Rape Shield Law, 18 Pa. Cons. Stat. Ann. § 3104. (*See* Doc. 1-6 at 2, 4/24/07 Trial Ct. Op. Omnibus Pretrial Mot.) In his written proffer, Nyamwange submitted that, pursuant to 18 Pa. Cons. Stat. § 3104, he should be able to present evidence of the victim's prior sexual conduct to show bias and motive on her part to falsely accuse Nyamwange of rape in order to avoid an admission of infidelity. (*See id.* at 7.) Specifically, Nyamwange stated that, during discovery, the Commonwealth tendered laboratory reports showing

that serology tests revealed possible seminal material from a thong obtained from the victim, and that the DNA evidence was "inconclusive" concerning the source of the seminal material.  (*See* Doc. 10-5 at 60 ¶¶ 18-19, 2/7/06 Omnibus Pretrial Mot.) Nyamwange further submitted that, pursuant to *Olden v. Kentucky*, 488 U.S. 227 (1988) and *Wall*, *supra*, 606 A.2d 449, a relationship with another is relevant to prove a victim's motive to falsely accuse another of rape.  (*See id.* ¶ 20.)  Nyamwange therefore asserted that, in order to lay a foundation for an argument that the victim in this case had a motive to falsify the allegation against him to protect an intimate relationship with a third party, he must be permitted to question the victim about the source of the semen found in her thong and to offer the blood and DNA reports disclosed by the Commonwealth in discovery inasmuch as the DNA from the semen in the victim's thong was consistent with DNA from more than one individual (*i.e.*, a mixture).  (*See id.*)  He therefore requested that the trial court allow him to "cross-examine the complainant about her relationships and possible sources of the *mixture* found on her thong."  (*See id.* at 61.)

At the time of the March 19, 2007 hearing on the Omnibus Pretrial Motion, the Commonwealth conceded that a third party's DNA was located in a stain in the victim's underwear and that additional DNA testing would be performed to confirm the identity of that individual.  (*See* Doc. 10-5 at 70, 3/19/07 Tr.)  Although

17

Nyamwange's counsel admitted that his issue may have been somewhat premature at that stage in light of the Commonwealth's statement that additional testing would be needed to confirm the identity of the third party who contributed the DNA, counsel nevertheless argued that, if testing revealed that the third party was the victim's "on again/off again boyfriend," an exception to the Rape Shield Act would allow him to explore the relationship between the victim and the third party. (*See id.* at 71.)

Following the hearing, the parties submitted briefs on their issues, and by Opinion and Order dated April 24, 2007, the trial court disposed of the motion. (*See* Doc. 1-6.) In its opinion, the trial court provided the following analysis of Nyamwange's request in his written proffer:

> To determine the admissibility of evidence of prior sexual contact in sexual assault cases, our Superior Court has held that the defendant must first submit a specific proffer of the evidence to be admitted and explain why he believes it is relevant to his defense. Cmwlth v. Fernsler, 715 A.2d 435, 439 (Pa. Super. 1998). Where the proffer amounts to mere speculation and conjecture, it will be rejected for admission at trial, and no further inquiry will be made. Id. If, however, the proffer is sufficiently specific, the trial court will then be required to make a three-fold analysis of the substance of the proffer at an *in camera* hearing, in which the court will determine (1) if the evidence sought to be admitted is relevant to the defense; (2) whether the evidence sought to be admitted is merely cumulative of evidence otherwise admissible at trial; and (3) whether the evidence which the accused wishes to introduce at trial is more probative than prejudicial. Id. at 440.
>
> In this case, Defendant's proffer is the very epitome of vague and conjectural. He offers no evidence to support his claim that the alleged victim had a motive to falsely accuse Defendant other than the

18

conclusory statement that the alleged victim sought to avoid admission of infidelity.

(*See id.* at 7-8.)  The trial court therefore denied Nyamwange's motion for an *in camera* hearing under 18 Pa. Cons. Stat. Ann. § 3104; however, in a footnote, the trial court stated as follows:

> This, of course, does not prevent Defendant from challenging the reliability of Commonwealth's DNA evidence on the basis of the presence of a third party's semen on the alleged victim's thong. Defendant is precluded, however, from making issue of the identity of the third party who produced the sample or the nature of his relationship with the alleged victim.

(*See id.* at 8 n.1.)

Prior to trial, counsel for Nyamwange submitted on his behalf a renewed written proffer under 18 Pa. Cons. Stat. Ann. § 3104 in which he stated that the Commonwealth's DNA analysis revealed that the victim's thong contained a mixture of DNA and that Nyamwange and Tepedino were identified as contributors.  (*See* Doc. 9-2 at 9, Def.'s Renewed Written Proffer, ¶ 8).  He also stated that the Commonwealth's discovery revealed that Joseph Tepedino and the victim were in constant contact by cell phone during the afternoon of the incident, and that, at some point, Tepedino and the victim stopped cell phone communications.  (*See id.* at 8 ¶ 3.) Nyamwange attached the statement of Tepedino in which he states that the victim told him she was raped.  (*See id.* at 8-9 ¶¶ 4-5.)  He then noted that the Commonwealth had

admitted in a prior proceeding (the hearing on the Omnibus Pretrial Motion) that

Tepedino and the victim had an "*on again, off again relationship*," (*see id.* at 9 ¶ 6).

Nyamwange argued that the presence of Tepedino's DNA on the victim's

thong was proof of her intimate relationship with Tepedino and that a jury could infer

that the victim had a motive to lie about what she did during the time when she lost

cell phone contact with Tepedino for fear of losing him as her boyfriend if she

admitted to infidelity with Nyamwange *or* to gain Tepedino's sympathy in the hope of

furthering her "on again, off again relationship" with him. (*See id.* ¶ 11.)

Nyamwange submitted that the victim's relationship with Tepedino is relevant and

would be offered to support her motive to falsify her accusation of rape and sexual

assault against Nyamwange. (*See id.* at 10 ¶ 13.) He further suggested that, if the

Commonwealth is permitted to argue that there is no reason for the victim to allege

that Nyamwange raped her unless the allegation is true, fairness requires allowing

Nyamwange to prove and argue the relationship with Tepedino provides the victim

with a motive to lie. (*See id.* ¶ 16.) Finally, as he did in his original proffer,

Nyamwange cited *Olden* and *Wall* in support of his arguments and request "to allow

the Defendant to cross-examine the complainant about her relationship with Joseph

Tepedino since the existence of the intimate relationship with a third party is relevant

to whether the complainant had a motive to lie about or fabricate the accusation." (*Id.*

at 10-11.)

At oral argument on the renewed proffer, counsel for Nyamwange also stated that the victim's relationship with Tepedino, and the presence of his DNA on her thong, would be relevant to impeach the victim's statements to the SAFE nurse who administered a rape kit at the Pocono Medical Center in which the victim denied having consenting sexual relations within seventy-two (72) hours or for two (2) weeks prior to the incident with Nyamwange. (*See* Doc. 9-2 at 30, 9/4/07 Tr. of Arg. on Renewed Proffer.)

> In ruling on the record on the renewed proffer, the trial court stated as follows:
>
> And in looking at the case law, the issue of bias and motive, certainly looking at it first to see if it's relevant, it is relevant with respect to these charges.
>
> So with respect to the questioning of Mr. Tepedino or the victim solely regarding their relationship, that is very limited, but it can be explored only to the extent of did they have an intimate physical relationship.
>
> With respect to Mr. Tepedino's DNA evidence on the thong, that is not relevant, and that is out. I don't want anybody talking about the DNA on the thong.
>
> I understand your argument with respect to the SAFE nurse. However, there are a multitude of explanations and reasons and arguments that can be made with respect to not having, you know, any sexual activity within 72 hours or 2 weeks, and I'm not going to allow you to go into that with any of the witnesses.
>
> But I do think the bias, the motive is relevant, and I think that certainly their relationship generally can be explored without getting into specifics

of the sexual nature of their relationship, okay.

(*See id.* at 32-33.)  The following exchange then took place between counsel and the

trial court:

> [COUNSEL FOR NYAMWANGE]:   Your honor, just so I understand, I
> would be allowed to ask the SAFE nurse that any physical redness,
> tenderness that she detected in the alleged victim's genitalia area that she
> couldn't say when that was caused or what caused it.
>
> THE COURT:  Right.  I think that's an absolutely fair question.
>
> [COUNSEL FOR THE COMMONWEALTH]:  That's fair?
>
> THE COURT:  Sure, because she can't, or I don't think she would be
> able to.  You know, that's - -
>
> [COUNSEL FOR NYAMWANGE]:  I just wanted to make sure that - - I
> can't ask the victim or Tepedino when were you last together, that kind
> of stuff.
>
> THE COURT:  And what were you doing and, you know, what color
> thong did you have on.[5]

(*See id.* at 33.)

On direct appeal to the Pennsylvania Superior Court from his judgment of

sentence, Nyamwange argued in his appellate brief that a new trial was required

because the trial court abused its discretion when it recognized Nyamwange's right in

---

[5]Admittedly, the trial court's ruling and subsequent exchange with counsel on the record on
this issue is somewhat inarticulate.  However, we do not find that it resulted in an abuse of discretion
such that there is any basis for us to disturb the decisions of either the trial court or the Pennsylvania
Superior Court on the issue that now is before us in the instant Petition.

ruling on his pretrial proffer to offer evidence of the victim's motive to fabricate the allegation of non-consensual sexual contact, but then denied Nyamwange the right to use evidence necessary to establish the victim's relationship with a third-party, and specifically the evidence of Tepedino's DNA on the victim's thong, which was the necessary foundation for her motive.  (*See* Doc. 10 at 20, Br. for Appellant.) Nyamwange argued that the trial court's ruling implicated his rights under the Sixth Amendment, Due Process Clause of the Fourteenth Amendment, and the Pennsylvania Constitution to present a defense by presenting witnesses favorable to the defense and through cross-examination of witnesses.  (*See id.*)

In disposing of this issue on direct appeal from his judgment of sentence, the Pennsylvania Superior Court described the applicable standard for review of a trial court's ruling on the admissibility of evidence as follows:

> The admissibility of evidence is within the sole discretion of the trial judge, whose ruling will not be disturbed absent an abuse of that discretion. ***Commonwealth v. Bishop***, 936 A.2d 1136 (Pa. Super. 2007), *appeal denied*, 951 A.2d 1159 (Pa. 2008).  'Admissibility depends on relevance and probative value.  Evidence is relevant if it logically tends to establish a material fact in the case, tends to make a fact at issue more or less probable or supports a reasonable inference or presumption regarding a material fact.' ***Commonwealth v. Grzegorzewski,*** 945 A.2d 237, 239 (Pa. Super. 2008), *appeal denied*, 954 A.2d 575 (Pa. 2008), *quoting* ***Commonwealth v. Drumheller***, 808 A.2d 893, 904 (Pa. 2002), *cert. denied*, 539 U.S. 919 (2003) (quotation marks and citation omitted). An abuse of discretion is not merely an error of judgment, but occurs when the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias, or ill-

will. ***Bishop***, 936 A.2d at 1143.  An error regarding the admissibility of evidence will be deemed harmless where this Court concludes beyond a reasonable doubt that the error could not have contributed to the verdict. ***Commonwealth v. Northrip***, 945 A.2d 198 (Pa. Super. 2008), *appeal denied*, 959 A.2d 929 (Pa. 2008).

(Doc. 1-3, 6/8/09 Pa. Super. Ct. Op., at 5-6.)  The Superior Court then set forth the

text of Pennsylvania's Rape Shield Law, and summarized the potentially applicable

exception as follows:

> This Court has recognized an exception to Section 3104 exists when the evidence tends to directly exculpate the accused by showing that the alleged victim is biased and thus has a motive to lie, fabricate, or seek retribution because such evidence affects the defendant's constitutional right to confront and cross-examine witnesses.  The trial court must then examine the evidence to determine whether the probative value outweighs its prejudicial effect and whether there is an alternative way to prove the motive to fabricate.

> ***Northrip***, 945 A.2d at 203-204 (citations and quotation omitted).

(*See id.* at 6-7.)

The Superior Court analyzed Nyamwange's argument that the trial court

erred in its application of the Rape Shield Statute as follows:

> The record reflects that the trial court focused on [Nyamwange's] proffer. At the preliminary hearing, the Commonwealth conceded that there was evidence of a third party's sperm, or a mixture of DNA, on the victim's panties.  N.T., 3/19/07, at 6.  The court made clear, however, that it refused [Nyamwange's] request to explore the details of the victim's sexual relationship with her boyfriend, other than the fact that it existed, because [Nyamwange's] proffer was speculative and vague.  The court explained that the proffer offered 'no evidence to support his claim that the alleged victim had a motive to falsely accuse [Nyamwange] other

24

than the conclusory statement that the alleged victim sought to avoid admission of infidelity.' Trial Court Opinion, 4/24/07, at 8.  The court noted, however, that its Rape Shield ruling did not preclude [Nyamwange] from challenging 'the reliability of the Commonwealth's DNA evidence on the basis of the presence of a third party's semen on the alleged victim's thong.'  *Id.* at n.1.

We conclude that the trial court neither erred nor abused its discretion by limiting, in accord with the Rape Shield Law, [Nyamwange's] cross-examination of the victim and her boyfriend regarding the DNA mixture on the victim's panties and the details of their sexual relationship. [Nyamwange] provided scant support for his argument that this testimony was relevant to his defense either in exculpatory fashion or to prove bias or motive.  The mere fact that the victim had a boyfriend with whom was or was not sexually active does not establish she had any hostility or bias toward [Nyamwange], or possessed a motive to fabricate an assault. As stated above, Tepedino knew the victim had had lunch with [Nyamwange] and had traveled willingly to his home; there was no logical reason for the victim to fabricate an assault.  The jury was made aware of the sexual relationship between the victim and her boyfriend and assigned to that evidence its relative weight. [Nyamwange's] argument challenging the applicability of the Rape Shield Law and the trial court's actions fails.

(*See id.* at 7-8.)

In arguing the issue that he has presented in the instant Petition, Nyamwange

asserts that his constitutional right to confront witnesses against him was violated

when the trial court limited his cross-examination and prohibited the use of the

evidence of Tepedino's DNA found on the victim's underwear to impeach and/or

confront the victim and Tepedino about their relatioship.  (*See* Doc. 9, Reply Brief, at

12-25.)  The Sixth Amendment guarantees the criminal defendant a right "to be

25

confronted with the witnesses against him." U.S. Const. amend. VI. The core of the

Confrontation Clause is the right of every defendant to test the credibility of witnesses

through cross-examination. *Davis v. Alaska*, 415 U.S. 308, 315-16 (1974).

However, the Confrontation Clause does not grant defendants completely

unrestricted leeway in cross-examining witnesses: "It does not follow . . . that the

Confrontation Clause of the Sixth Amendment prevents a trial judge from imposing

any limits on defense counsel's inquiry into the potential bias of a prosecution

witness." *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986). As such, trial judges

"retain wide latitude insofar as the Confrontation Clause is concerned to impose

reasonable limits on such cross-examination based on concerns about, among other

things, harassment, prejudice, confusion of the issues, the witness' safety, or

interrogation that is repetitive or only marginally relevant." *Id.* In this way, the

Confrontation Clause "guarantees an *opportunity* for effective cross-examination, not

cross-examination that is effective in whatever way, and to whatever extent, the

defense might wish." *Id.* (quoting *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985)).

We begin our consideration of whether the state court decision in this case

was contrary to or an unreasonable application of clearly established federal law by

observing that, in analyzing this issue on direct appeal, the Pennsylvania Superior

Court considered it solely in terms of whether the trial court abused its discretion in its

ruling that Nyamwange's written proffer was speculative and vague and that an exception to the Rape Shield Statute therefore did not apply to allow him to cross-examine the victim and her boyfriend concerning the DNA mixture found on the victim's underwear.  As such, the Superior Court did not explicitly consider whether this ruling violated Defendant's Sixth Amendment right to confront witnesses.

Nevertheless, as discussed, *supra*, the exceptions to the Rape Shield Statute in Pennsylvania "have been recognized in an effort to reconcile the effect of the statute in excluding evidence with the accused's sixth amendment right to confrontation and cross-examination."  *See Guy*, *supra*, 686 A.2d at 400.  Further, as discussed, *supra*, the written proffer procedure that was followed in this case was developed to ensure that a defendant's Sixth Amendment rights to confront and cross-examine witnesses against him are not violated by the application of the Rape Shield Law.  *See Wall*, *supra*, 606 A.2d at 457; *see Burns*, *supra*, 988 A.2d at 691.  A state court need neither cite the decisions of the United States Supreme Court nor even be aware of its cases, "so long as neither the reasoning nor the result of the state-court decision contradicts them."  *Early v. Packer*, 537 U.S. 3, 8 (2002); *see also Priester v. Vaughn*, 382 F.3d 394, 398 (3d Cir. 2004);  *Young v. Grace*, Civil No. 3:07-CV-016, 2010 WL 3489046, at *5 (M.D. Pa. Sep. 2, 2010) (Vanaskie, Circuit Judge Sitting by Designation). Therefore, even though United States Supreme Court cases concerning a defendant's

27

Sixth Amendment rights are not explicitly cited in the state court decisions in this case, where the decisions were based on the application of Pennsylvania cases that balance the interests of the victim and the Sixth Amendment rights of the defendant in reaching their holdings, a consideration of Nyamwange's Sixth Amendment rights is implicit in the decisions.

As set forth in the Standard of Review, *supra,* Nyamwange has the burden of establishing that the state court's adjudication of his claim is "contrary to" clearly established precedent of the Supreme Court of the United States or involves an "unreasonable application" of such precedent. *See Williams, supra*, 529 U.S. 362.

In his reply brief, Nyamwange argues that *Olden, supra*, is the relevant precedent in a habeas proceeding raising a confrontation claim. (*See* Doc. 9 at 14.) He avers that pursuant to *Olden*, "[a] relationship with another is relevant to prove a victim's motive to falsely accuse another of rape." (*See id.* (citing *Olden*, 488 U.S. 227).)

Although he argues that the instant case is "almost indistinguishable from *Olden*" (*see id.* at 15), we reach the opposite conclusion. In *Olden*, two male defendants who had been indicted for kidnapping, rape, and forcible sodomy asserted a defense of consent. *Olden*, 488 U.S. at 229. Specifically, they asserted that the victim falsely accused defendants of rape to protect her relationship with her

28

boyfriend, with whom she was having an extramarital affair at the time of the incident in question, and with whom she was living at the time of trial.  *Id.* at 230.  Under the facts of that case, the victim admitted that she had become intoxicated at a bar and voluntarily left with one of the defendants, and that both defendants raped her before dropping her off at her request in the vicinity of her boyfriend's house.  *Id.* at 228.  The boyfriend heard a noise outside his house, came outside, saw his girlfriend getting out of the car with the two defendants in it, and the victim immediately told her boyfriend that the defendants had raped her.  *Id.* at 228-29.

At trial, the defendant sought to introduce evidence that the victim was living with her boyfriend at the time of trial to show her motive to lie to him about the rape to protect her relationship with him.  *Id.*  However, the trial court denied the defendant's request to introduce this evidence, including by precluding his ability to cross-examine the victim on the issue after she testified on direct examination that she was living with her mother at the time of trial.  *Id.* at 230.  One defendant was acquitted on all charges, and the second defendant was acquitted of kidnapping and rape, but convicted of forcible sodomy.  *Id.*

The United States Supreme Court held that the convicted defendant's Sixth Amendment right to confront the witnesses against him was violated by the state court's denial of his request to cross-examine the victim regarding her cohabitation

29

with her boyfriend at the time of trial. *Id.* at 232-33.  The Court concluded that where the defendant consistently asserted that he and the victim engaged in consensual sexual acts and that the victim lied to her boyfriend about being raped out of fear of jeopardizing her relationship with him, "'[a] reasonable jury might have received a significantly different impression of [the witness'] credibility had [defense counsel] been permitted to pursue his proposed line of cross-examination.'" *Id.* at 232 (quoting *Delaware v. Van Arsdall, supra,* 475 U.S. at 680).  In applying the *Van Arsdall* factors in considering whether the error that occurred in disallowing this cross-examination was harmless beyond a reasonable doubt, the Court concluded that, where the victim's testimony was central to the prosecution's case and was corroborated only by the "largely derivative testimony" of her boyfriend, and where "the State's case against [the defendant] was far from overwhelming," the Court could not conclude beyond a reasonable doubt that the violation of the defendant's rights under the Confrontation Clause was harmless. *Id.* at 233.

In contrast, in the case at hand, the trial court did not preclude Nyamwange from questioning the victim and her boyfriend about their relationship.  Rather, the trial court's ruling on Nyamwange's renewed proffer acknowledged that the relationship between the victim and her boyfriend is relevant to the issue of the victim's bias and motive, and therefore, the trial court ruled that Nyamwange could

question the victim and her boyfriend as to whether they had an intimate physical relationship.  (*See* Doc. 9-2 at 32-33, 9/4/07 Tr. of Arg. on Renewed Proffer.) Nyamwange's argument is that, where the witnesses did not answer as he anticipated in that the victim testified that Tepedino "was a friend.  I dated him before, and I'm dating him now" (*see* Doc. 9-3 at 15), and Tepedino testified that the victim was not his girlfriend at the time of the November 22, 2007 incident (*see* Doc. 9-5 at 37-38), the trial court's failure to allow him to then confront these witnesses with the DNA evidence violated Nyamwange's rights under the Confrontation Clause.  However, Nyamwange fails to present a compelling argument that the failure of the witnesses to acknowledge their relationship should change the trial court's determination that Nyamwange's proffer that the DNA evidence showed the victim's motivation to lie "was the very epitome of vague and conjectural" (*see* Doc. 1-6 at 7-8), and that the evidence thus was barred by the Rape Shield Statute.

 *Olden* also is distinguishable because in that case, the victim was seen by her boyfriend getting out of a car with two men in it, and thus the jury appropriately could draw an inference that the victim would have a motive to lie to protect her relationship with her boyfriend by stating that she had been raped rather than admitting to consensual sexual activity.  Here, the victim would not have a motive to lie to her boyfriend that would be created by him observing her with Nyamwange.  Tepedino

testified that he knew that the victim was at Nyamwange's house and that he did not know exactly where Nyamwange's house was (*see* Doc. 9-5 at 23-24, Tepedino Test.), and thus, there was no possibility of him observing the victim and Nyamwange there. Moreover, contrary to Nyamwange's argument, a motivation to lie cannot logically be inferred from the victim's loss of cell phone contact with Tepedino.  Where Tepedino knew that the victim was at Nyamwange's house waiting to go to work, the victim could have explained her loss of cell phone contact in a variety of ways, including that she was talking to Nyamwange or watching television or reading, *et cetera*.  As observed by the Pennsylvania Superior Court in its opinion affirming Nyamwange's conviction, "[t]he mere fact that the victim had a boyfriend with whom she was or was not sexually active does not establish she had any hostility or bias toward [Nyamwange], or possessed a motive to fabricate an assault."  (*See* Doc. 1-3 at 8, 6/8/09 Pa. Super. Ct. Op.)  As such, this case also is distinguishable from *Olden* in that if the evidence of Tepedino's DNA on the victim's thong was placed before the jury here, it would not give them a "significantly different impression" of the victim's credibility with respect to her allegations against Nyamwange because the fact of her relationship with Tepedino in of itself does not establish a motive for the victim to lie about being attacked by Nyamwange.  *See Olden*, 488 U.S. at 232 (quoting *Van Arsdall*, 475 U.S. at 680).

Based on the foregoing, we conclude that the standards relied upon by the state courts on the issue now before us in the instant Petition were in accord with applicable federal law, and thus, we find that Nyamwange has failed to demonstrate that he is entitled to habeas relief.  Accordingly, the Petition will be denied.

**CONCLUSION**

For the foregoing reasons, the Petition for Writ of Habeas Corpus (Doc. 1) will be denied.  We also will deny a certificate of appealability based on the reasoning in this Memorandum.  However, Petitioner is advised that he has the right for thirty (30) days to appeal our order denying his petition, *see* 28 U.S.C. § 2253(a); Fed. R. App. P. 4(a)(1)(A), and that our denial of a certificate of appealability does not prevent him from doing so, as long as he also seeks, and obtains, a certificate of appealability from the court of appeals.  *See* Fed. R. App. P. 22.  An appropriate Order will enter.